IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA,<br>          Plaintiff, | * |  |
|  | * |  |
|          v. | * | CRIMINAL NO.:   WDQ-14-0310 |
|  | * |  |
| JEFFREY BRIAN COHEN,<br>          Defendant. | * |  |
|  | * |  |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

On June 5, 2015, Jeffrey Brian Cohen pled guilty to wire
fraud,[1] aggravated identity theft,[2] false statements to an
insurance regulator,[3] and obstructing justice.[4]  ECF No. 385 at 1
(plea agreement).  Pending is Cohen's motion to withdraw the
plea.  ECF No. 480.  On September 8, 2015, the Court held a
hearing and received evidence on the voluntariness of Cohen's
plea.  ECF No. 483.  For the following reasons, Cohen's motion
was denied.

---

[1] 18 U.S.C. § 1343 (2012).

[2] 18 U.S.C. § 1028A (2012).

[3] 18 U.S.C. § 1033(a) (2012).

[4] 18 U.S.C. §§ 1512, 1513 (2012).

I.    Background[5]

    A.    Overview of the Crime

    Cohen was the President and Chairman of the Board of Indemnity Insurance Corporation RRG[6] ("Indemnity"), a Delaware corporation located at Sparks, Maryland.  ECF No. 385 at 11. Indemnity provided general liability insurance, liquor liability insurance, and excess liability insurance coverage to persons and companies in the entertainment industry.  *Id*.  From 2008 to 2012, Indemnity insured more than 3,000 policyholders and collected more than $100 million in premiums.  *Id*.  Indemnity was regulated by the Delaware Insurance Commissioner ("Commissioner").  *Id*.

    A.M. Best is an independent insurance ratings agency that rated insurance companies and risk retention groups.  *Id*.  In April 2008, A.M. Best gave Indemnity an "A-" rating, contingent upon a $1 million capital infusion.  *Id*. at 11-12.  Cohen provided A.M. Best with a fake document purporting to establish the capital infusion.  *Id*. at 12.  In 2009, Cohen asked A.M. Best to increase his financial size category, relying on a purported $47 million bank balance at BNP Paribas, which Cohen

---

[5] The facts are from the factual stipulation in the Plea Agreement, ECF No. 385, this Court's May 7, 2015 Memorandum Opinion, ECF No. 324, and testimony received at the September 8, 2015 hearing ("Hr'g").

[6] "RRG" means "risk retention group."

established with a fake letter of credit. *Id.* In December 2009, A.M. Best placed Indemnity under review. *Id.* Cohen gave A.M. Best fake documents purporting to show that he had provided Indemnity a $10 million infusion of capital. *Id.* Cohen listed the $10 million on Indemnity's ledger as a capital contribution and created fake confirmations for Indemnity's bank accounts. *Id.*

Marcum LLP ("Marcum") and BDO USA LLP ("BDO") are independent accounting firms that audited Indemnity. *Id.* From 2008 to 2013, Cohen sent several false and fraudulent documents to Marcum and BDO for their audit of Indemnity's financial statements. *Id.*

First Insurance Funding ("First Insurance") is an Illinois premium financing company that provided loans to persons or companies who sought to finance the costs of insurance premiums. *Id.* Under premium financing agreements, First Insurance paid companies--such as Indemnity--insurance premiums, and persons or companies would repay First Insurance the cost of insurance premiums plus interest. *Id.* Cohen established a "mini Ponzi thing" under which he created fake financing applications for nonexistent policyholders, and used the premiums paid by First Insurance as operating cash for Indemnity. *Id.* As part of the scheme, Cohen created a fake business manager for the financing applications called Monahan & O'Brien ("M&O"); Cohen used the

identifying information of Indemnity's former attorney to create M&O. *Id.* In January 2010, Cohen emailed First Insurance a false and fraudulent premium financial application purportedly signed by "T.M." *Id.* at 13.

SCOR Reinsurance Company ("SCOR") is a French financial services company that sold reinsurance policies. *Id.* at 14. U.S. RE Corporation ("U.S. RE") is a New York corporation that brokered reinsurance policies issued by SCOR to companies, such as Indemnity. *Id.* The Light Group LLC ("The Light Group") managed several Las Vegas nightclubs and lounges. *Id.* The Light Group was required to buy insurance from companies meeting certain liquidity and size requirements. *Id.* Cohen made false representations to the Light Group and other policyholders about the reinsurance available to Indemnity. *Id.* Cohen altered SCOR and U.S. RE reinsurance documents to present fake reinsurance coverage to The Light Group and others. *Id.*

In 2012, the Commissioner began investigating Indemnity's financial stability. ECF No. 324 at 2. In January 2013, Cohen sent a letter to the Commissioner in which he falsely asserted that Indemnity had $5.1 million in unencumbered cash on deposit at Susquehanna Bank. ECF No. 385 at 13. In April 2013, Cohen sent a fax to the Commissioner falsely stating that Susquehanna Bank had confirmed that Indemnity had $5.1 million in cash on deposit at the bank. *Id.* Cohen had used the identity of a

Susquehanna Bank employee, "N.B.," to create fake bank confirmations "without her permission and with the knowledge that she was a real person whose identity he was using for the fraud." *Id.*

In May 2013, the Commissioner obtained a seizure order from the Delaware Court of Chancery authorizing the regulatory takeover of Indemnity. ECF No. 324 at 3.  In June 2013, the Delaware Insurance Commissioner initiated civil proceedings against Cohen-controlled companies, including Indemnity. ECF No. 385 at 14.  In July 2013, after examining Indemnity under the seizure order, the Commissioner filed a petition to liquidate Indemnity "in light of (i) acts of fraud by Cohen and (ii) Indemnity's unsound financial condition." ECF No. 324 at 3.  On August 5, 2013, Cohen resigned as Indemnity's Chairman of the Board. *Id.*

In October 2013, Attorney#1 and Attorney#2 referred Cohen's criminal offenses to the U.S. Attorney for the District of Maryland. ECF No. 385 at 14.  In February 2014, Cohen threatened Attorney#2, stating, "Now I'm coming after you. You're next." *Id.* at 14-15.

B.   Procedural History

On November 25, 2014 the grand jury returned a second superseding indictment that charged Cohen with fifteen counts of wire fraud under 18 U.S.C. § 1343, five counts of aggravated

identity theft under 18 U.S.C. § 1028A, two counts of money laundering under 18 U.S.C. § 1957, five counts of making false statements to an insurance regulator under 18 U.S.C. § 1033(a), and four counts of obstructing justice under 18 U.S.C. §§ 1512, 1513.  ECF No. 73.  On December 2, 2014, a third superseding indictment charged Cohen with the same counts and made minor corrections to the second superseding indictment.  ECF Nos. 78, 80.

On June 1, 2015, Cohen's trial began.  ECF No. 381.  On June 5, 2015, Cohen pled guilty to one count each of wire fraud, aggravated identity theft, false statements to an insurance regulator, and obstructing justice.  ECF Nos. 385, 389.[7]  Through standby counsel, William B. Purpura, Esq., Cohen negotiated the plea with the government attorneys prosecuting the case.  ECF

---

[7] Cohen pled guilty to counts one (wire fraud), twenty (aggravated identity theft in relation to the use of N.B.), twenty-four (false statements to an insurance regulator), and twenty-eight (obstructing justice).  ECF No. 385 at 1.  Page two of the plea agreement originally stated that Cohen was pleading guilty to count sixteen, which related to his use of T.M.'s identity; however, "sixteen" was crossed out and "twenty" was handwritten above it.  *Id.* at 2.  In signing the plea agreement, Cohen acknowledged that "there are no other agreements, promises, undertakings or understandings between [he] and [the government] other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties."  *Id.* at 10.  During the plea colloquy, the Court stated: "let me ask you--and this is an area which I really want to make sure that, given the circumstances, that it's clear--has anybody promised you anything to get you to enter the plea?"  ECF No. 395 at 14 (transcript of the plea proceeding).  Cohen responded, "[n]othing other than what's included in the plea."  *Id.*

No. 480 at 1.  Purpura reviewed the plea agreement with Cohen in a room on the Sixth Floor of the U.S. Courthouse.  ECF No. 517 at 2.[8]  When the parties assembled in Courtroom 3A for the plea colloquy, Cohen made additional requests, discussed below.

      1.   Cohen's Version of Events

At the hearing, Purpura testified that Cohen told him that he would only plead guilty if his wife, Crystal Cohen, was "made whole."[9]  Hr'g.  When the parties met in Courtroom 3A for the plea colloquy before The Honorable J. Frederick Motz, Purpura told Cohen that the government had agreed to Cohen's last request that it return all of Mrs. Cohen's jewelry.  *Id.* Purpura saw Cohen write something about a bank account on his copy of the final plea agreement; until then, neither Cohen's nor Mrs. Cohen's bank accounts were the subject of plea negotiations.  *Id.*  Purpura asked one of the prosecutors, Harry Gruber, Esq., about the bank accounts.  *Id.*  Gruber asked what account to which Purpura was referring; Purpura did not know, and asked Cohen to identify the account.  *Id.*  Cohen said something about $20,000 in relation to the accounts.  *Id.*  To

---

[8] Cohen acknowledged reading the plea agreement and discussing it with Purpura before signing it.  ECF No. 385 at 10; ECF No. 395 at 14-15 (transcript from the plea proceeding, during which Cohen stated that he had read the plea agreement).

[9] According to Purpura, Cohen negotiated the facts in the factual stipulation and the counts to which he would plead guilty; Cohen further negotiated "very well" for the return of seized property.  Hr'g.

the best of Purpura's recollection, Cohen also asked whether there were any other accounts jointly held by Cohen and Mrs. Cohen, or held in Mrs. Cohen's name alone, which had been seized. *Id*. Gruber responded "no," then hesitated and said he would check with another agent who then looked up whether an account containing about $20,000 had been seized. *Id*. Gruber agreed to return the funds seized from a joint M&T bank account containing about $20,000 and stated that no other accounts had been seized.[10] *Id*. At no time did Cohen mention a Fidelity bank account by institution name or seizure number. *Id*. Purpura believed that Gruber and his co-counsel Joyce McDonald, Esq., had acted with honesty and diligence, and simply made a mistake when they overlooked the seizure of Mrs. Cohen's Fidelity account. *Id*.

Cohen testified that when he reviewed the final plea agreement in the courtroom, he said "there [are] no bank accounts in here." *Id*. When Gruber had asked "what bank account," Cohen stated "my wife's bank accounts." *Id*. According to Cohen, Gruber stated that the government had not seized Mrs. Cohen's bank accounts. *Id*. When Gruber asked Cohen to identify a bank account, Cohen responded, the "joint M&T bank account" that had a recent $22,000 deposit. *Id*. Gruber then

---

[10] *See* ECF No. 385 at 7 (handwritten notation in the plea agreement indicating the return of the funds in the M&T bank account).

conferred with another agent and agreed to return the funds in the joint M&T bank account. *Id.* Because Gruber had stated that none of Mrs. Cohen's accounts had been seized, Cohen did not ask about the Fidelity account; had he known about that account, he would not have pled guilty. *Id.*[11]

2. The Government's Version of Events

Gruber testified that, to avoid later confusion, he had made clear during plea negotiations that he wanted the plea agreement to include seizure numbers for property that the government would return to Mrs. Cohen. *Id.* When the parties met in Courtroom 3A, Gruber believed that the plea agreement was final. *Id.* Purpura approached Gruber and told him that Cohen had an additional request about bank accounts. *Id.* Purpura asked Cohen to identify the bank account, then told Gruber and McDonald "Crystal's bank account." *Id.* Gruber again asked "what accounts, or what account?" *Id.* Purpura referred to an account in Mrs. Cohen's name that had about $20,000 in it. *Id.* Gruber believed that Cohen was referring to Mrs. Cohen's M&T bank account, which had a balance of about $20,000. *Id.* That account had been the subject of negotiations between the government and Mrs. Cohen's attorney; because Mrs. Cohen had used that account to deposit rental payments from Mrs. Cohen's

---

[11] On cross-examination, Cohen acknowledged lying to policyholders in the past. Hr'g.

brother, the government decided not to seize that account.  *Id.*
Thus, Gruber told Cohen that "we didn't take that account," and
agreed to return the funds in the joint M&T account.[12]  *Id.*
Gruber--who was concerned that the last minute plea negotiations
were keeping Judge Motz waiting late on a Friday afternoon--did
not recall stating that "none of [Cohen's] wife's accounts had
been seized."  *Id.*

 3.   Subsequent Procedural History

On June 17, 2015, Jeffrey Cohen wrote the Court asking it
to order the government to return funds seized from Mrs. Cohen's
Fidelity Investment account.  ECF No. 393.  On July 27, 2015,
the Court, construing Cohen's letter as a motion to modify the
plea agreement, denied the motion.  ECF No. 444.

On August 3, 2015, Cohen moved to withdraw the plea
agreement.  ECF No. 480.  On August 18, 2015, the government
opposed Cohen's motion.  On August 31, 2015, Cohen replied. ECF
No. 506.  On September 1, 2015, Cohen supplemented his motion.
ECF No. 507.  On September 3, 2015, the government supplemented
its response.  ECF Nos. 517 (supplemental response), 519 (sealed
exhibits).  On September 8, 2015, the Court held a hearing

---

[12] The government learned about a week later that Cohen had
allegedly been referring to Mrs. Cohen's Fidelity account ending
in 1721, which also had a balance of about $20,000.  ECF No. 517
at 2.  The government has agreed to return the funds in the
Fidelity account "to protect the record in this case going
forward."  ECF No. 517 at 12 n.1.

during which Purpura, Cohen, and Gruber testified about the voluntariness of Cohen's plea under *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013).[13]

II.  Analysis

Under Fed. R. Crim. P. 11(d)(2)(B), a defendant may withdraw a guilty plea, if "he can show a fair and just reason for requesting the withdrawal."  Courts consider six factors in determining whether a defendant has carried this burden: "(1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary, (2) whether the defendant has credibly asserted his legal innocence, (3) whether there has been a delay between the entering of the plea and the filing of the motion, (4) whether defendant has had close assistance of competent counsel, (5) whether withdrawal will cause prejudice to the government, and (6) whether it will inconvenience the court and waste judicial resources."  *United States v. Moore*, 931 F.2d 245, 248 (4th Cir. 1991).

None of the factors is dispositive.  *Id*.  However, "the first, second, and fourth  factors are the most significant, as they 'speak most straightforwardly to the question of whether the movant has a fair and just reason to upset settled systemic

---

[13] The Court found that Cohen had not established his entitlement to an evidentiary hearing under *United States v. Moore*, 931 F.2d 245 (4th Cir. 1991) (defendant not entitled to an evidentiary hearing when he failed to file an affidavit or proffer witness testimony).

expectations' by withdrawing his guilty plea." *United States v. Cheese*, 411 F. App'x 609, 610-11 (4th Cir. 2011) (*quoting United States v. Sparks*, 67 F.3d 1145, 1154 (4th Cir. 1995)).

A.   Voluntariness

Cohen contends that his plea was rendered involuntary on the basis of Gruber's statement about his wife's bank account. ECF No. 480 at 2.  The government asserts that Cohen's plea colloquy demonstrates the voluntariness of his plea.  ECF No. 491 at 10-12.  The government further asserts that there was no misrepresentation about Mrs. Cohen's bank accounts; there was simply a misunderstanding about what bank account was the subject of last minute plea negotiations.  ECF No. 517 at 5, 8-10.

When--as here--a defendant states under oath that his plea is voluntary and not the product of promises or agreements other than those in the plea agreement, he "may not *ordinarily* repudiate his statements to the sentencing judge." *Fontaine v. United States*, 411 U.S. 213, 215, 93 S. Ct. 1461, 1462, 36 L. Ed. 2d 169 (1973) (internal quotation marks omitted) (emphasis added); *Fields v. Attorney Gen. of State of Md.*, 956 F.2d 1290, 1299 (4th Cir. 1992) ("Absent clear and convincing evidence to the contrary, a defendant is bound by the representations he makes under oath during a plea colloquy.").  Thus, a plea's voluntariness generally turns on whether the plea proceeding has

been "properly conducted." *United States v. Faris*, 388 F.3d 452, 456 (4th Cir. 2004) ("The most important of [the six *Moore*] factors is the first one, which addresses the question of whether the waiver colloquy was properly conducted.") (*citing United States v. Wilson*, 81 F.3d 1300, 1305-07 (4th Cir. 1996)); United States v. Jones, 916 F. Supp. 558, 561 (E.D. Va. 1996) ("[When] a plea is truly knowing and voluntary, no one of these [*Moore*] factors itself justifies withdrawal.").

However, though "solemn declarations in open court . . . present 'a formidable barrier in any subsequent collateral pro-ceedings,'" that barrier is not insurmountable. *United States v. White*, 366 F.3d 291, 295-96 (4th Cir. 2004) (*quoting Blackledge v. Allison*, 431 U.S. 63, 74 (1977)). Although plea colloquies conducted under Fed. R. Crim. P. 11 are intended "to flush out and resolve all such issues, . . . like any procedural mechanism, its exercise is neither always perfect nor uniformly invulnerable to subsequent challenge." *Fontaine v. United States*, 411 U.S. 213, 215, 93 S. Ct. 1461, 1462, 36 L. Ed. 2d 169 (1973); *White*, 366 F.3d at 296 (remanding for evidentiary hearing on whether government made oral promise that defendant could conditionally plead guilty).

To the extent Cohen argues that the prosecutor's statement caused him to plead guilty involuntarily, the Court relies on the following standard:

13

> A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Brady v. United States*, 397 U.S. 742, 755, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970) (*quoting Shelton v. United States*, 246 F.2d 571, 572 n. 2 (5th Cir. 1957) (en banc), *rev'd on other grounds*, 356 U.S. 26, 78 S. Ct. 563, 2 L. Ed. 2d 579 (1958) (*"Shelton II"*));[14] *see also United States v. Fisher*, 711 F.3d 460, 464-65 (4th Cir. 2013); *Lassiter v. Turner*, 423 F.2d 897, 900 (4th Cir. 1970) ("[T]he plea must not have been induced by promises or threats which deprive it of the character of a voluntary act").

Accordingly, to set aside a plea as involuntary, Cohen, "who was fully aware of the direct consequences of the plea[,] must show that (1) 'some egregiously impermissible conduct (say, threats, *blatant misrepresentations*, or untoward blandishments by government agents) antedated the entry of his plea' and (2) 'the misconduct influenced his decision to plead guilty or, put

---

[14] *Brady* adopted the standard for voluntariness articulated by Judge Tuttle of the Court of Appeals for the Fifth Circuit. *See Brady*, 397 U.S. at 755, 90 S. Ct. 1463 (*quoting Shelton II*, 246 F.2d at 572 & n.2 (adopting standard stated in *Shelton v. United States*, 242 F.2d 101, 115 (5th Cir.) *judgment set aside*, 246 F.2d 571 (5th Cir. 1957) *rev'd*, 356 U.S. 26, 78 S. Ct. 563, 2 L. Ed. 2d 579 (1958)(*"Shelton I"*))).

another way, that it was material to that choice.'" *Fisher*, 711

F.3d at 464-65 (*quoting Ferrara v. United States*, 456 F.3d 278,

290 (1st Cir. 2006) (*citing Brady*, 397 U.S. at 755, 90 S. Ct.

1463).

### 1.   Egregious Conduct

"The types of promises or threats which deprive a plea of

its voluntary character are not susceptible of comprehensive

definition . . . ." *Lassiter*, 423 F.2d at 900 (prosecutor's

threat "to do what the law will not permit, if it motivates a

defendant ignorant of the impossibility, renders the plea

involuntary"). Misrepresentations potentially meriting

withdrawal of a guilty plea are not limited to promises *intended*

to induce a guilty plea; "plain and inexcusable misrep-

resentations not anchored to any permissible litigation

strategy" may amount to egregious conduct. *Fisher*, 711 F.3d at

465 (*quoting Ferrara*, 456 F.3d at 293) (internal quotation marks

and alterations omitted). Further, that promises or statements

were made in good faith does not preclude a finding of egregious

conduct. *Id.* at 467 (*citing United States v. Hammerman*, 528

F.2d 326, 331-32 (4th Cir. 1975)).

*Fisher* and *Ferrara* involved misconduct related to evidence

underlying the charges to which the defendants pled guilty. In

*Fisher*, a law enforcement officer investigating the case lied in

a sworn search warrant affidavit that led to the recovery of

inculpatory evidence forming the basis of the charge to which
the defendant pled guilty.  711 F.3d at 466.  He later pled
guilty to fraud and theft in connection with his official
duties.  *Id.* at 462, 466.  The prosecution team had been unaware
of the officer's misconduct when the defendant pled guilty.  *Id.*
at 497.  In finding egregious conduct, *Fisher* relied on the
"highly uncommon" facts of that case "in which gross police
misconduct [went] to the heart of the prosecution's case."  *Id.*
at 466.[15]  Similarly, in *Ferrara*, on which *Fisher* relies, the
government withheld and manipulated exculpatory evidence in
connection with the murder charge to which the defendant pled
guilty.  456 F.3d at 281-86.  Additionally, the government had
"affirmative[ly] misrepresent[ed]" to the defendant that it
would "satisfy its continuing duty to disclose all exculpatory
evidence in a timely manner."  *Id.* at 293.  The First Circuit
found "the government's nondisclosure [to be] so outrageous that
it constituted impermissible prosecutorial misconduct" rendering
the defendant's guilty plea involuntary.  *Id.* at 293.[16]

---

[15] The *Fisher* Court further reasoned that vacating the plea
"supported . . . the important interest of deterring police
misconduct"; if defendants cannot challenge guilty pleas because
of "subsequently discovered police misconduct, officers may be
more likely to engage in [and conceal] such conduct."  711 F.3d
at 469.

[16] *Ferrara* has spawned a long line of cases challenging guilty
pleas on the basis of the prosecutor's failure to disclose
misconduct by a laboratory technician who tampered with

*Fisher* and *Ferrara* have been criticized as taking an overly "expansive interpretation of the relevant language from *Brady v. United States*." *Hasbajrami v. United States*, No. 11-CR-623, 2014 WL 4954596, at *3 (E.D.N.Y. Oct. 2, 2014) ("I am not convinced that *Ferrara*, and especially *Fisher*, were correctly decided . . . ."); *see also United States v. Rains*, No. 1:06-CR-00035-MP, 2015 WL 4647292, at *7 (N.D. Fla. Aug. 5, 2015)(noting that *Fisher*'s "persuasiveness . . . is questionable" because "no other circuit court has adopted *Fisher*' s expansive holding"). *Fisher* is, of course, binding on this Court.  However, the Court is mindful of the "extraordinary" circumstances that led to the *Fisher* court's finding of involuntariness and the fact-specific nature of this inquiry.  *See Fisher*, 711 F.3d at 462; *see also Hammond v. United States*, 528 F.2d 15, 18 (4th Cir. 1975)("[N]ot . . . every item of misinformation which counsel may impart vitiates the voluntariness of a plea. Each case must depend largely on its own facts.")(defense counsel's gross mis-representation about the length of the defendant's likely sentence if he went to trial rendered plea involuntary). Further, in tracing the origin of the *Fisher* "egregiously impermissible conduct" requirement from *Brady* to Judge Tuttle's

---

evidence; not one case has resulted in the vacatur of a guilty plea.  *See United States v. Hampton*, No. CRIM. 09-10281-WGY, 2015 WL 3794750, at *4 (D. Mass. June 18, 2015)(collecting cases).

opinion in *Shelton I*, it is clear that Judge Tuttle had been concerned with situations in which defendants were misled "by promises of leniency"; for example, when a defendant had been promised by an officer in one state that if he pled guilty to charges in that state, he would not be prosecuted by officials in another state,[17] or when a prosecutor improperly promises a lenient sentence.[18]

Unlike *Fisher*, here, even assuming the truth of Cohen's version of events, Gruber's statement about the forfeiture of Mrs. Cohen's bank account did not go to "the heart of the prosecution's case," nor did he make "unfulfilled or unfulfillable" promises of leniency about Cohen's sentence. *Fisher*, 711 F.3d. at 466; *Shelton I*, 242 F.2d at 114-15; *cf.* *Hammerman*, 528 F.2d at 331-32 (guilty plea involuntary when prosecutor incorrectly told defendant he would not receive a prison sentence).   Rather, Gruber's statement involved

---

[17] *See Shelton I*, 242 F.2d at 114 & n.3 (*citing Bryarly v. Howard*, 165 F.2d 576, 577 (7th Cir. 1948) (reversing summary dismissal of writ of habeas corpus alleging that guilty plea had been involuntary)).

[18] *See id.* at 114 & n. 6 (*citing* United *States v. Sehon Chinn*, 74 F. Supp. 189, 191 (S.D.W. Va.) *aff'd*, 163 F.2d 876 (4th Cir. 1947)(defense counsel's promise of a nominal sentence insufficient to withdraw guilty plea, though prosecutor's similar promise might be)).

forfeiture--a collateral matter.[19]   Cohen has not provided--nor

has this Court found--a case in which a court found a guilty

plea involuntary on facts similar to those here.  Moreover, the

government has agreed to release the funds from the Fidelity

account to Mrs. Cohen, thus mitigating the effect of the

misunderstanding.  ECF No. 517 at 12 n.1.  Gruber's statement

was not egregious and does not merit a finding that Cohen had

involuntarily pled guilty.  *See Richardson v. United States*, No.

4:11-CR-110-FL, 2015 WL 4366198, at *4 (E.D.N.C. July 16, 2015)

(petitioner's allegations of government misconduct did not

relate to events "that underpinned the government's evidence";

thus, he "has not alleged exculpatory evidence so extraordinary

as to undermine the knowing and voluntary nature of his plea");

*cf. Fisher*, 711 F.3d at 470 ("Whether to prosecute, issue a

warrant, indict and convict are serious matters that are decided

in large measure based on what a police officer relates. So when

an officer does not tell the whole truth, public confidence in

the fair administration of criminal justice inevitably is

---

[19] *See also United States v. Turcotte*, 333 F. Supp. 2d 680, 682
(N.D. Ill. 2004) (describing forfeiture as a collateral matter);
Fed. R. Crim. P. 32.2(c)(ancillary proceeding to determine any
asserted third party interests in the forfeited property
required before the entry of a final forfeiture order).

eroded.")(*quoting United States v. Gribben*, 984 F.2d 47, 48 (2d Cir. 1993)).[20]

> 2.   Inducement

Additionally, Cohen has not shown that Gruber's statement induced his guilty plea. *See Fisher*, 711 F.3d at 467.   To demonstrate inducement, Cohen must show "a reasonable probability that, but for the misconduct, he would not have [pled] guilty and would have insisted on going to trial."   *Id*. (*quoting Ferrara*, 456 F.3d at 294).   In other words, Cohen must show that had he known that Mrs. Cohen's Fidelity bank account had been seized, he would have rejected the plea and gone to trial.

Reasonable probability is assessed under an objective standard; that is, Cohen must show "that a reasonable defendant standing in his shoes likely would have altered his decision to plead guilty, had he known about [the prosecutor's] misconduct." *Id*.(defendant would not have pled guilty had he known about the probable success of a motion to suppress crucial evidence).   The "reasonable probability" standard mirrors the prejudice test

---

[20] Reflecting the high bar set by *Fisher*'s "egregiously impermissible conduct" requirement, one lower court in this circuit has concluded that a prosecutor's alleged threat to prosecute members of defendant's family if the defendant refused to plead guilty was insufficient to find involuntariness under *Fisher*.   *Thomas v. United States*, No. 1:07CR42-2, 2014 WL 1230217, at *7 (M.D.N.C. Mar. 25, 2014) *appeal dismissed*, 580 F. App'x 220 (4th Cir. 2014).

used in cases in which defendants try to vacate a guilty plea because of ineffective assistance of counsel. *See Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985)("[D]efendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty.").[21]  In such cases, the "petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky,* 559 U.S. 356, 372, 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010).

Cohen contends that he told Purpura that before pleading guilty Mrs. Cohen "had to be made whole." ECF No. 480 at 1. Even if Cohen would have declined to plead guilty had he known that Mrs. Cohen's Fidelity bank account had been seized, he has not shown that a "reasonable" or "rational" defendant would have done the same. The government made significant concessions in the plea agreement; notably, it agreed to dismiss 27 of the 31 pending counts in the third superseding indictment and return several valuable assets. ECF Nos. 78; 385 at 7; 491 at 12.

Additionally, Cohen's trial strategy appeared to hinge on his contention that the government would be unable to prove that

---

[21] *See also United States v. Chin*, 54 F. Supp. 3d 87, 90 (D. Mass. 2014)(applying *Hill* to a motion to withdraw a guilty plea).

anyone had been harmed by his conduct.[22]  However, this Court had

previously addressed--and rejected--Cohen's argument that the

government must demonstrate financial loss to the victims of his

wire fraud scheme.  *See* ECF No. 324 at 48-49 (*citing United*

*States v. Bunn*, 26 F. App'x 139, 142 (4th Cir. 2001)("Financial

loss is not an essential element of wire fraud. The gravamen of

the offense is not . . . financial loss to the victim; it is,

rather, the intent to obtain money or property from the victim

of the deceit.")(internal citation and quotation marks omitted);

*United States v. Valencia*, 600 F.3d 389, 432 (5th Cir.

2010)("The success of the schemes is not relevant to wire

fraud")).  Further, although opening statements are not usually

considered as evidence, during his opening statement Cohen

admitted to the jury that he had committed the conduct

---

[22] See ECF No. 497 at 57 (transcript of Cohen's opening
statement) ("In order to find me guilty, it's not enough for the
Government to create a picture in your mind that I'm a bad
person. They must specifically produce evidence that businesses
of [Indemnity] . . . [were] injured."); *id.* at 56 ("Nobody lost
any money in this scenario. The evidence will show that there
are no victims. There are no policyholders of [Indemnity] that
lost any money."); *id.* at 61 ("Now, conspicuously absent from
the prosecution's opening statement is any specific example of
harm to support their theory. [The prosecutor] threw out a lot
of scary pictures and a lot of scary scenarios, but he didn't
give you any information on who was harmed. What policyholder
lost any money? There are none."); *id.* at 62 ("The Government
can only speculate that policyholders were harmed by my
actions.").

underlying many of the charges.[23]  Taken together with this
Court's previous rejection of Cohen's legal theory, Cohen has
not convinced the Court that a reasonable defendant in his shoes
would have rejected the plea offer and gone to trial.

Finally, Cohen has not asserted--nor is there any evidence-
-that his plea colloquy had been improperly conducted.[24]  *See*

---

[23] *See* ECF No. 497 at 56 ("I want to be completely honest with
you. I've already admitted to the Government that I
misrepresented some of our financials. . . . I inflated some
assets in our business on our balance sheet. It wasn't a
significant crime. It wasn't a significant aspect. It was very
small, individual misrepresentations, and each one was for a
very specific reason, which I'll get into."); *id.* at 62 ("I
admitted to the federal agents that I had misrepresented some of
my financial statements."); *id.* at 64 ("Yes, I misrepresented
some of the financials. I tried to make myself look bigger for
some specific reasons, but no policyholder was harmed."); *id.* at
65 ("The Government cannot support their allegations that I
defrauded policyholders, so they're going to try to convince you
that I defrauded regulators. . . . They must prove that I
intentionally submitted information in order to influence the
regulators. . . . Now, this argument fails, because the evidence
will clearly show that I misrepresented some of the financials
for a very specific reason.").

[24] Although, as noted above, a properly conducted plea colloquy
will not always cure a guilty plea induced by improper
government conduct, it bears noting that during the plea
colloquy, the Court asked Cohen whether anyone had "promised
[him] anything to get [him] to enter the plea," to which Cohen
responded, "[n]othing other than what's included in the plea."
ECF No. 396-1 at 14 (transcript of the plea proceeding).  "[A]n
appropriately conducted Rule 11 colloquy can only serve meaning-
fully if the court is entitled to rely on the defendant's
statements made under oath to accept a guilty plea." *United
States v. Bowman*, 348 F.3d 408, 417 (4th Cir. 2003); *see United
States v. Ubakanma*, 215 F.3d 421, 424 (4th Cir. 2000) (defendant
stated under oath during plea colloquy that he had not been
coerced into pleading guilty).

*United States v. Wilson*, 81 F.3d 1300, 1307 (4th Cir. 1996)
("[T]he key to" whether a motion to withdraw a guilty plea
should be granted is "whether or not the Rule 11 proceeding was
properly conducted").  Accordingly, Cohen has not shown that his
plea was involuntary; this factor favors the government.

B.   Actual Innocence

Cohen bears a "heavy" burden in showing that he should be
allowed to withdraw his guilty plea because of actual innocence.
*United States v. Maher*, 108 F.3d 1513, 1530 (2d Cir. 1997).
This is because "self-inculpatory statements he made under oath
at [a] plea allocution 'carry a strong presumption of verity.'"
*Id.* (*quoting Blackledge*, 431 U.S. at 74, 97 S. Ct. 1621); *see
also United States v. Faris*, 388 F.3d 452, 458 (4th Cir. 2004)
(sworn statements during a plea colloquy are afforded "strong
weight").  The Court "must draw all permissible inferences in
favor of the government and against the defendant, especially
when, as here, the defendant has gone to trial, heard most of
the government's evidence, and then pleaded guilty." *Maher*, 108
F.3d at 1530.

To credibly assert actual innocence, Cohen need not
"provide conclusive proof of innocence."  United States v.
Howard, 549 F. App'x 164, 168 (4th Cir. 2013) (*citing United
States v. Thompson-Riviere*, 561 F.3d 345, 353 (4th Cir. 2009)).
Instead, Cohen must "present evidence that (1) inspires belief

24

and (2) tends to either defeat the elements in the government's prima facie case or make out a successful affirmative defense." *Id.*

### 1.   Wire Fraud

Cohen asserts that he is innocent of wire fraud because his conduct was not "mainstream fraud"; although he "fully admitted his actions," the government cannot show that policy holders were harmed.  ECF No. 480 at 3-6.[25]  The government generally argues that Cohen's assertions of legal innocence are belied by his sworn statements at the plea proceeding.  ECF No. 491 at 15. As to wire fraud, the government contends that Cohen's legal argument is incorrect, and the government has, and will, establish loss to policyholders.  *Id.*

As noted above, this Court has already rejected Cohen's assertion that wire fraud requires harm to victims.  *See* ECF No. 324 at 48-49.  Cohen's reliance on sentencing guidelines to support his contention that "[w]ithout loss there can be no victims of [a] crime" is unavailing.  ECF No. 480 at 5.

---

[25] Cohen further asserts that the government has "attempt[ed] to expand the Plea Agreement to encompass actions of fraud against thousands of policyholders," which is not supported by the stipulated facts.  ECF No. 506 at 3.  However, Cohen's argument appears to relate to his assertions about the lack of harm.  *See* ECF No. 506 at 3-5.  The issue, here, however, is whether Cohen is legally innocent to the sole count to which he pled, which, as discussed above, does not require proof of harm.  Cohen has not credibly asserted legal innocence to count one.

Although the amount of loss to victims may be relevant to his
sentence, *see* U.S.S.G. § 2B1.1, it is not relevant to whether he
committed wire fraud.  Accordingly, Cohen has not credibly
demonstrated his innocence to this offense.

   2.   Obstructing Justice

   Cohen asserts that he is legally innocent of obstructing
justice; although he admits stating to Attorney#2 "Now I'm
coming after you. You're next," Cohen now contends that he was
"alluding to the fact that Cohen had not named [Attorney#2] in
any of his civil suits" about Indemnity.  ECF No. 480 at 6-7.
Although Cohen generally asserted that he had "substantial
evidence including witness testimony" supporting his innocence;
he had not proffered that testimony; thus, as noted above, he
had not demonstrated his entitlement to present evidence on this
issue.  Further, his assertions are contradicted by the "strong
weight" afforded to his sworn guilty plea and admission that he
committed the unlawful conduct underlying this charge.  *See* ECF
No. 395 at 30; *Faris*, 388 F.3d at 458.  Accordingly, Cohen has
not credibly demonstrated his innocence to this offense.

   3.   Aggravated Identity Theft

   Cohen asserts that he is actually innocent of aggravated
identity theft because his use of "T.M.'s"[26] name was not a

---

[26] Although T.M.'s and N.B.'s names have been disclosed in public
filings, the Court will refer to them by their initials.

sufficiently unique identifier.  ECF No. 480 at 8.  He contends
that "[i]t was established at trial that Cohen's actions related
to T.M. had no unique identifier.  Cohen used the name of T.M.
alone and the use of the name was not related to the 'real'
person the [g]overnment alleges."  *Id.*  Cohen further contends
that the stipulated facts in the plea agreement "do not
specifically reference the actions involving TM as using his
personal identifying information as a real person."  *Id.*
However, as the government notes, Cohen pled guilty to count
twenty, which involved his use of N.B.'s identity, not counts
sixteen or seventeen, which involved his use of T.M.'s identity.
ECF Nos. 385 at 1-2; 517 at 12.

    Section 1028A bars (1) knowingly transferring, possessing,
or using a means of identification of another person, (2)
without lawful authority, (3) during, and in relation to, a
predicate felony offense--in this case, wire fraud and false
statements to an insurance regulator.  28 U.S.C.
§ 1028A(a)(1),(c)(5); *United States v. Abdelshafi*, 592 F.3d 602,
607 (4th Cir. 2010).  A "means of identification" includes "any
name or number that may be used, alone or in conjunction with
any other information, *to identify a specific individual*,
including any . . . name, social security number, date of birth,

[or] official State or government issued driver's license . . .
." 28 U.S.C. § 1028(7) (emphasis added).[27]

Cohen relies on *United States v. Mitchell*, 518 F.3d 230,
233 (4th Cir. 2008). There, the Fourth Circuit addressed
whether someone's name was a sufficiently unique identifier to
constitute "a means of identification of another person" such
that the defendant's use of that name amounted to aggravated
identity theft under 18 U.S.C. § 1028A. *Mitchell*, 518 F.3d at
233-235. The Court observed that "[a] name alone . . . would
likely not be sufficiently unique to identify a specific
individual because many persons have the same name." *Id*. at
234. However, when a "non-unique identifier," such as a name,
is coupled with other information to identify a specific
individual, 'a means of identification of another person' is
created." *Id*. The Fourth Circuit held that the defendant's use
of a fake driver's license bearing the name "Marcus Jackson" did
not sufficiently identify "a specific Marcus Jackson." *Id*. at
235 (reversing district court's decision that use of a name

---

[27] The phrase "alone or in conjunction with any other
information" does not limit the types of information that may be
used with a name, "but by its own terms anticipates the cross
referencing of identifying information." *United States v. De La
Cruz*, No. CRIM.A. 13-10022-RGS, 2014 WL 3925497, at *1 (D. Mass.
Aug. 12, 2014).

along constituted use of a means of identification of another
person).[28]

Cohen has not asserted his actual innocence as to the use
of N.B.'s identity; in fact, Cohen has "freely admitted" to
using N.B.'s identity, and stated that "[t]he only applicable
actions related to violations of § 1028A are the use of
identifying information of real people known as NB and LS[;]
both of these individuals were used in furtherance of a
violation of § 1033 as admitted by Cohen."  ECF No. 480 at 9.[29]
For that reason, Cohen has not met his burden.  *Maher*, 108 F.3d
at 1530.

Additionally, the government introduced evidence at trial
showing that Cohen had used N.B.'s name, job title, and business
name and letterhead in an email to the Delaware Department of
Insurance.  ECF No. 519-1 at 1 (sealed) (trial exhibit 27).

---

[28] In *Mitchell*, the Fourth Circuit noted that the driver's
license belonging to the "real" Marcus Jackson included his full
name, Marcus Deyone Jackson.  518 F.3d at 235.  Additionally,
the month, day of birth, and driver's license number did not
match.  *Id*. at 235-36.

[29] At the hearing, Cohen appeared to argue that the offense of
false statements to an insurance regulator under 18 U.S.C. §
1033 could not support the offense of aggravated identity theft.
The government argued that § 1033 is a valid predicate offense.
The government is correct.  Predicate offenses include "any
offense that is a felony violation of . . . any provision
contained in [Chapter 47] (relating to fraud and false
statements), other than this section or section 1028(a)(7)."  18
U.S.C.A. § 1028A(c)(4).  Chapter 47 includes § 1033.  *See* 18
U.S.C., ch. 47, §§ 1001-1040.

Cohen attached to that email a purported Susquehanna Bank confirmation form in which he signed N.B.'s name, including her middle initial, and her job title, which matched the information on a business card she had given Cohen--which included her middle initial. *Id.*; ECF No. 519-2 (sealed) (sentencing exhibit 258). Together, Cohen's use of N.B.'s identifying information amounts to aggravated indentity theft under 18 U.S.C § 1028A. *See United States v. Kuc*, 737 F.3d 129, 134 (1st Cir. 2013) (discussing *Mitchell* and holding that the defendant's use of a person's name and company name sufficiently identified a specific individual); *United States v. Johnson*, 261 F. App'x 611, 612 (4th Cir. 2008) (unpublished)(use of a person's name as a signatory on a forged company check sufficiently identified that person); *cf. Mitchell*, 518 F.3d at 235-36 (use of identity not sufficiently unique when other identifiers did not match, and use of person's name lacked the appropriate middle name). Accordingly, Cohen has not credibly demonstrated his innocence to this offense.

4. False Statements to an Insurance Regulator

Cohen asserts that "his actions, while not appropriate, did not amount to the level of a material harm that Congress intended to protect against under [18 U.S.C.] § 1033." ECF No. 480 at 10. Further, although he "has admitted that he represented certain financial statements to insurance

30

regulators, . . . the intent and the reasoning for the

misrepresented financial statements creates a logical defense

against the offense." *Id.*

Section 1033(a) provides that

(1) Whoever is engaged in the business of insurance
whose activities affect interstate commerce and
knowingly, with the intent to deceive, makes any false
material statement or report . . . (A) in connection
with any financial reports or documents presented to
any insurance regulatory official or agency or an
agent or examiner appointed by such official or agency
to examine the affairs of such person, . . . shall be
punished . . . .

18 U.S.C. § 1033(a).  Cohen asserts that his misrepresentations

had been "intended to increase the value of [his] company," and

did "not amount to a loss."  ECF No. 480 at 10 (*citing, inter*

*alia, Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338, 125 S. Ct.

1627, 1629, 161 L. Ed. 2d 577 (2005)).  In *Dura Pharm*, the U.S.

Supreme Court stated "[a] private plaintiff who claims

securities fraud must prove that the defendant's fraud caused an

economic loss."  544 U.S. at 338, 125 S. Ct. 1627 (*citing* 15

U.S.C. § 78u-4(b)(4)).  *Dura Pharm* is inapposite; it did not

involve false statements under 18 U.S.C. § 1033(a) or establish

that the government must prove a loss to prove a § 1033(a)

violation.

Rather, § 1033(a) merely requires that a knowingly false

material statement or report is made with the intent to deceive.

"In general, a false statement is material if it has a natural

tendency to influence, or [is] capable of influencing, the
decision of the decisionmaking body to which it was addressed."
*Neder v. United States*, 527 U.S. 1, 16, 119 S. Ct. 1827, 1837,
144 L. Ed. 2d 35 (1999) (internal quotation marks and citation
omitted); *see also United States v. Philip Morris USA Inc.*, 566
F.3d 1095, 1122 (D.C. Cir. 2009) ("[The] materiality requirement
is met if the matter at issue is of importance to a reasonable
person in making a decision about a particular matter or
transaction.")(internal quotation marks and citation omitted).
There is no indication that materiality turns on whether a loss
results, or whether the statement must be intended to deceive in
a way that causes a loss.  Accordingly, Cohen has not credibly
demonstrated his innocence of this offense.  In sum, this factor
favors the government.

    C.   Delay

    Cohen moved to withdraw his guilty plea about two months
after he pled guilty; however, his motion was precipitated by
this Court's denial of his earlier motion to modify the plea
agreement, and was filed only a week after the Court's Order.
*See* ECF Nos. 393, 444, 480.  Accordingly, Cohen did not
unreasonably delay moving to withdraw his guilty plea.  However,
this factor alone "is insufficient to justify a withdrawal of
his plea in view of all the other factors weighing heavily

against granting the motion." *United States v. Bowman*, 348 F.3d
408, 416 (4th Cir. 2003).

D.   Assistance of Counsel

To prevail on the fourth factor, incompetent assistance of
counsel, Cohen must show "(1) that his counsel's performance
'fell below an objective standard of reasonableness' and (2)
that 'there [was] a reasonable probability that, but for
counsel's error, he would not have pleaded guilty and would have
insisted on going to trial.'" *Bowman*, 348 F.3d at 416 (*quoting*
*United States v. DeFreitas*, 865 F.2d 80, 82 (4th Cir. 1989)).

Initially, it should be emphasized that Cohen has acted as
his counsel in this case.  Further, Cohen has stated under oath
that he was satisfied with the assistance provided by his
standby counsel, Purpura.  ECF No. 395 at 5.[30]  This factor
favors the government.

---

[30] Additionally, there is no constitutional right to standby
counsel, or to "hybrid representation" as occurs when the
defendant and standby counsel share the duties of
representation.  *See McKaskle v. Wiggins*, 465 U.S. 168, 183, 104
S. Ct. 944, 953, 79 L. Ed. 2d 122 (1984); *Schaefer v. United*
*States*, No. 4:05-CR-01133-RBH-1, 2015 WL 1549148, at *4 (D.S.C.
Apr. 8, 2015)(citing cases that stand for the proposition that
"[w]ithout a constitutional right to standby counsel, a
defendant generally cannot prove standby counsel was
ineffective"); *Cassell v. Harkelroad*, No. 5:04CV67-3-MU, 2006 WL
2927191, at *6 (W.D.N.C. Oct. 10, 2006)("There is no
[c]onstitutional [r]ight to [s]tandby [c]ounsel.").  Thus,
Cohen--who elected to proceed *pro se*--cannot meet his burden on
this factor.

E.   Prejudice to the Government, Inconvenience to the
     Court and Preservation of Judicial Resources

Cohen asserts there is no prejudice to the government as it "still has all of its files and is actively working on the matter." ECF No. 480 at 11.  He further asserts there is no inconvenience to the Court "because a jury trial is a Constitutional right." *Id.*

To the contrary; Cohen pled guilty one week into a four week trial, causing the Court to dismiss the jury and the government to excuse its witnesses who had been called to testify.  It would be a substantial burden on the government to reassemble its case for trial by relocating and preparing witnesses.  *See United States v. Graham*, 466 F.3d 1234, 1238 (10th Cir. 2006).  Additionally, finding the time for a four-week trial on the Court's crowded docket would be difficult--if not impossible before the New Year.  Accordingly, the fifth and sixth factors favor the government.

III. Conclusion

For the reasons stated above, the Court denied Cohen's motion to withdraw his guilty plea.


_9/10/15_
Date

_____
William D. Quarles, Jr.
United States District Judge

34